*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0462p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SUSAN P. ASMO,

　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

KEANE, INC.,

　　　　　　*Defendant-Appellee.*

No. 05-3818

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-00156—George C. Smith, District Judge.

Argued: April 20, 2006

Decided and Filed: December 18, 2006

Before: MOORE, GRIFFIN, and CUDAHY, Circuit Judges.[*]

---

**COUNSEL**

**ARGUED:** John S. Marshall, MARSHALL & MORROW, Columbus, Ohio, for Appellant. John F. Welsh, BELLO, BLACK & WELSH, Boston, Massachusetts, for Appellee. **ON BRIEF:** John S. Marshall, Louis A. Jacobs, MARSHALL & MORROW, Columbus, Ohio, Michael Roy Szolosi, Sr., McNAMARA & McNAMARA, Columbus, Ohio, for Appellant. John F. Welsh, BELLO, BLACK & WELSH, Boston, Massachusetts, Charles C. Warner, PORTER, WRIGHT, MORRIS & ARTHUR, Columbus, Ohio, for Appellee.

　　　CUDAHY, J., delivered the opinion of the court, in which MOORE, J., joined. GRIFFIN, J., (pp. 10-13), delivered a separate dissenting opinion.

---

**OPINION**

---

　　　RICHARD D. CUDAHY, Circuit Judge. Susan Asmo (Asmo) claimed that the defendant Keane, Inc. (Keane) terminated her employment because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), and analogous provisions of Ohio Rev. Code, Chapter 4112. The district court granted summary judgment for the defendant Keane, and Asmo

---

[*] The Honorable Richard D. Cudahy, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

appealed.  For the reasons set forth below, we find that the district court erred in granting defendant Keane summary judgment, and we remand for further proceedings.

## I. BACKGROUND

Keane is a Massachusetts corporation authorized to do business in the State of Ohio. Keane provides information technology and business consulting services for corporations, governmental entities and healthcare facilities through a network of branch offices located across the United States and abroad.  Keane employs technical employees who work as consultants providing information technology-related services to its clients.

Plaintiff Asmo resides in Delaware County, Ohio and was an employee of defendant Keane. She began working for Keane on February 5, 2001 as a Selling, General, and Administrative Recruiter (SG&A Recruiter).  SG&A Recruiters are responsible for recruiting employees for Keane's non-technical sales and high-level management positions.  When Keane hired Asmo, three other SG&A Recruiters had been working for Keane since 1998: Valerie Shea, Thomas Becker and Christopher Hanson.  Keane hired one other SG&A Recruiter on February 5, 2001, Jennifer Bowman.

Asmo worked out of a home office in Columbus, Ohio.  She reported to Keane's Director of Corporate Recruiting, Scott Santoro, at Keane's corporate headquarters in Boston, Massachusetts. The SG&A Recruiters worked as a team, but each Recruiter was primarily assigned to cover a specific region within Keane's North America Branch operations.  Asmo was assigned to Keane's midwest region, which included branch offices in Columbus, Pittsburgh, Chicago, Minneapolis, Milwaukee, Indianapolis and Detroit.  Group Vice President Gary Gindele managed Keane's midwest region.

In mid-2001, Keane acquired Metro Information Service, Inc. (Metro), another IT company. Keane expected to achieve significant operation leverage from the acquisition by combining Keane and Metro branch offices in the same markets and by eliminating duplicate functions.

After the terrorist attacks in the United States on September 11, 2001, the IT industry suffered a particularly significant slowdown in the context of a general slowdown of the American economy.  Keane was affected by this slowdown, and it experienced a significant downturn in its business after September 11.

September 11, 2001 was also the day that Asmo learned she was pregnant with twins. Subsequently, sometime in October 2001 (the exact date and period of the month is disputed), Asmo informed the entire SG&A team of her pregnancy during a conference call. Asmo testified that all of the SG&A recruiters congratulated her, but Santoro remained silent during the congratulations and then tried to quickly change the conversation back to business matters.

Around the time the Metro acquisition was completed in November 2001, Keane's Vice President of Human Resources, Renee Southard, directed Santoro to reduce the number of recruiters on his staff. Santoro decided to eliminate one SG&A position, two Sourcing Specialist positions and roughly thirty other recruiting positions.

Santoro decided to consider three main factors in determining which of the five SG&A recruiters would be laid off: (1) relative tenure; (2) the number of hires each SG&A Recruiter had made in 2001; and (3) the forecasted hiring needs for 2002.  Santoro testified that he did not compare or review performance of the five recruiters because he considered them all to be "solid performers." Keane's Policy on "Layoff and Rehire," states that "[i]n determining which employees are to be affected by a layoff, consideration should be given to skills, business needs, performance history and employee tenure."

Asmo and another woman, Ms. Bowman, had the least tenure of all of the SG&A recruiters - less than one year. The other three SG&A recruiters had about three years of tenure. Regarding the third factor, Keane's forecasted hiring needs for 2002, Santoro engaged in several conversations with some of Keane's Group Vice Presidents, who gave Santoro a sense of the company's projected hiring needs in their respective regions. Midwest Group Vice President Gary Gindele (where Asmo was based) told Santoro that the Midwest region's hiring activity for the rest of 2001 would be diminished and that he did not plan to hire anyone new in 2002. Gary Richard, Vice President of the Western region (where Jennifer Bowman was assigned) told Santoro that the region was growing and that Bowman was an important part of its growth and success.

According to Keane, Santoro selected Asmo for layoff based on the three factors discussed above. Asmo had the least tenure, the lowest number of 2001 hires and Mr. Gindele predicted little need for new SG&A hiring in the Midwest region in 2002.

On December 4, 2001, Santoro informed Asmo that she was being laid off. Asmo testified that Santoro said "your expenses are a lot more expensive than the other recruiters" and that one of the reasons she was being terminated was that her salary was a lot higher than other recruiters. She also testified that Santoro said another reason she was being laid off was that she did not get the "face time" that other recruiters got. Santoro, on the other hand, testified in his deposition that salary played no role in deciding to lay off Asmo and that he did not keep track of recruiter expenses. He noted that during his conversation with Asmo she offered to take a salary reduction to retain her job, and he informed her that the layoff was not about salary. Asmo did acknowledge that Santoro also mentioned her number of hires and her tenure as reasons for her termination.

On February 20, 2003, Asmo filed her complaint in the district court, alleging that she had been unlawfully terminated from employment by Keane on December 7, 2001 because of her pregnancy. On May 31, 2005, the district court granted Keane's Motion for Summary Judgment and entered judgment dismissing Asmo's claims in their entirety.

Asmo timely filed her Notice of Appeal with this Court on June 22, 2005.

## II. DISCUSSION

This Court reviews a district court's decision to grant summary judgment *de novo. Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *See Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).

We use the familiar *McDonnell Douglas* burden-shifting framework to analyze Title VII pregnancy discrimination cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cline v. Catholic Diocese*, 206 F.3d 651, 658 (6th Cir. 2000). First, the employee must present a prima facie case. *Cline*, 206 F.3d at 658. If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer is able to do so, the burden shifts back to the employee, who, in order to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination. *Id.*

*A. Prima Facie Case*

The district court found that Asmo was unable to prove a prima facie case of discrimination. We disagree. In order to show a prima facie case of pregnancy discrimination under Title VII, a plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. Here, Keane concedes that Asmo has proven the first three elements. However, Keane argues Asmo was not able to meet the fourth step (a nexus) in establishing a prima facie case.

In *Barnes v. Gencorp Inc.*, 896 F.2d 1457, 1465 (1990), an age discrimination suit, this court modified the fourth element of the prima facie case test when discriminatory terminations are alleged in the context of a reduction in force. The court noted that the *McDonnell Douglas* framework requires that an employee show that his rejection was not due to one of the two most common reasons for rejection: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. *Id.* at 1464 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977)). However, the court went on to say that when a work force reduction by the employer is a factor in the decision,

> "[T]he most common legitimate reasons" for the discharge are the work force reductions. By showing the [first three] elements of a *McDonnell Douglas* case, a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge.

*Id.* at 1465. Thus, the court concluded that in a reduction in force case, the plaintiff "does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.*

This court has not addressed the question whether the *Barnes* additional-evidence requirement applies to discriminatory termination claims on the basis of pregnancy, where the fourth prong of the prima facie test requires a "nexus" between the pregnancy and the termination. However, it is unnecessary for us to reach this question because showing a nexus between the pregnancy and a termination, as required in the fourth step of establishing a prima facie case in pregnancy discrimination claims, should meet the *Barnes* additional-evidence requirement. The purpose of the additional evidence requirement is to ensure, in reduction of force cases, that the plaintiff has presented evidence to show that there is a chance the reduction in force is not the reason for the termination. Showing a nexus between a pregnancy and a termination can do just that.

Asmo met the nexus requirement in part by establishing temporal proximity between Keane's learning of her pregnancy and her termination. Temporal proximity can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (stating that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise"); *Nguyen v. City of Cleveland*, 229 F.3d 559, 567(6th Cir. 2000) (noting that "there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference" of a causal nexus). Temporal proximity can also satisfy the nexus requirement in the pregnancy discrimination context. *See Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 444 (6th Cir. 2002) (suggesting that temporal proximity would satisfy the nexus requirement); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005) (holding that temporal proximity satisfies the nexus requirement).

Even if Asmo was required to meet the *Barnes* additional-evidence requirement to establish a prima facie case, the evidence of temporal proximity would satisfy this requirement. In *Cline v.*

*Catholic Diocese*, 206 F.3d 651, 660 (6th Cir. 2000) we noted that "[t]he prima facie requirement for making a Title VII claim is not onerous, and poses a burden easily met." (citations omitted). In retaliation cases, this court has said it "has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed *indirect evidence* such as to permit an inference of retaliation to arise." *DiCarlo*, 358 F.3d at 421 (emphasis added). Thus, temporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee likewise may be "indirect evidence" in support of an inference of pregnancy discrimination to satisfy the *Barnes* requirement of additional "indirect evidence" that "tend[s] to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. Gencorp Inc.*, 896 F.2d at 1465.

In early December 2001, Keane decided to terminate Asmo's employment. This was within two months of October 2001, when Santoro learned that Asmo was pregnant. This temporal proximity is sufficient to establish a link between Asmo's pregnancy and her termination for the purposes of a prima facie case. *See DiCarlo*, 358 F.3d at 422 (twenty-one days); *DeBoer*, 124 F. App'x at 393 (approximately two months).

For these reasons, we find that the district court erred in holding that Asmo needed to present evidence beyond a nexus between her pregnancy and the adverse employment decision to satisfy the *Barnes* additional-evidence requirement, and we find that Asmo did establish a prima facie case.

*B. Pretext*

The second and more difficult question here is whether Asmo presented sufficient evidence to show that the reasons Keane gave for her termination were pretextual. The district court found that Asmo failed to provide such evidence after Keane gave a legitimate non-discriminatory reason for terminating Asmo's employment. While this issue is not clear-cut, we ultimately disagree with the district court and find that under summary judgment standards, there was sufficient evidence to show pretext.

The most significant evidence showing pretext is Santoro's conduct after Asmo announced she was pregnant with twins. In October 2001, Asmo, Santoro and the entire SG&A team were participating in a conference call, during which Asmo informed the team that she was pregnant with twins. The news was met with congratulations from all her colleagues except Santoro, who did not comment and then "simply moved on to the next business topic in the conference call." (J.A. 158-59). Santoro's initial silence is suspect. Pregnancies are usually met with congratulatory words, even in professional settings. When people work together they develop relationships beyond the realm of employment, and Asmo's pregnancy was particularly noteworthy given that she was pregnant with twins, a fairly unusual (and overwhelming) occurrence.

Additionally, though Santoro conducted weekly conference calls with the recruiters, he did not mention Asmo's pregnancy again until December 4, 2001, the day he terminated Asmo. Asmo's job involved considerable travel (forty to sixty percent of her time), something an employer might be concerned about given the announcement that Asmo was going to have *twins*, which most people know is a tremendous responsibility. Yet Santoro did not talk with Asmo about how she planned to deal with the impending arrival of her twins and/or what the company could do to help accommodate her. Instead, he did not mention her pregnancy at all. He also did not ask any of his colleagues to discuss Asmo's pregnancy with her, or to provide her with information about how the company accommodates parents. Given the combination of Asmo's job's being particularly demanding of time due to travel and her announcement of not just a pregnancy, but a pregnancy of twins, Santoro's silence could be interpreted as discriminatory animus.

Keane's argument that there are other possible explanations for Santoro's silence is correct and well-taken. However, in the context of summary judgment, where we examine the evidence in the light most favorable to the non-moving party, we believe that Asmo's argument is sufficient to call into question Santoro's motives. Santoro's silence is evidence of pretext because it can be read as speculation regarding the impact of Asmo's pregnancy on her work, and an employer's speculation or assumption about how an employee's pregnancy will interfere with her job can constitute evidence of discriminatory animus. *Laxton v. Gap Inc.*, 333 F.3d 572, 583-84 (5th Cir. 2003).

A statement by another Keane employee lends further evidence towards the conclusion that there was discrimination on the part of Keane. After Asmo was informed of her termination, she told Ron Knauer, who was Regional Sales Vice President for the midwest region and reported to Gary Gindele, that she was "seek[ing] legal counsel because [she] strongly believe[d] that [she] was let go from Keane because [she] was pregnant with twins." (J.A. 239). In response to Asmo's statement, Ron Knauer said, "I don't blame you, Susan. You need to do what you need to do." *Id.* In discrimination cases, in order to evaluate the relevance of a remark made by an individual who works for the employer (here, Keane), we consider both the substance of a remark as well as the influence the individual had in the employee's termination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998). Knauer did not have a direct or indirect influence on Asmo's termination, and thus, his remark alone is not sufficient to prove that Keane discriminated against Asmo. *Id.* at 354. However, this court has held that "[a]lthough discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination, the comments of a nondecisionmaker are not categorically excludable. Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Id.* at 356 (citations omitted).

Knauer's statements on their own do not prove discrimination, but they indicate that he might believe there was discriminatory action taking place at Keane. Instead of defending the company he worked for, he told Asmo to "do what she needed to do." (J.A. 239). Thus, while Knauer's statements are not dispositive, they lend further weight towards Asmo's argument that she was discriminated against and can serve as "circumstantial evidence establishing the existence of" discrimination. *Ercegovich*, 154 F.3d at 356.

In addition to the behavior and statements of Keane employees, there is evidence of pretext based on the proffered reasons given by Keane for Asmo's termination. "An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Keane's stated reasons for Asmo's termination to the Ohio Civil Rights Commission, to the district court, to this court and in Santoro's deposition are the following: 1) Asmo had the fewest hires of the (SG&A) recruiters; 2) Asmo had the same as or less seniority than the other SG&A recruiters; and 3) Asmo's region had the lowest anticipated hiring needs in 2002.

However, Asmo testified that in a December 4, 2001 phone conversation between Santoro and Asmo, Santoro stated five reasons for Asmo's termination: 1) Asmo had the fewest hires of the SG&A recruiters; 2) Asmo had the same as or less seniority than the other SG&A recruiters; 3) Asmo's salary was higher than the other SG&A recruiters; 4) Asmo's expenses were higher than the other SG&A recruiters; and 5) Asmo did not get the "face time" that other SG&A recruiters got. (J.A. 233).

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996) (order). Here, the inconsistencies in Keane's stated reasons for terminating Asmo's employment after she initiated this lawsuit and the reasons Santoro gave her over the phone are probative of pretext. The two reasons that Santoro initially offered Asmo that were then eliminated at the commencement of this lawsuit, that Asmo's salary was higher than the other SGA recruiters and that her expenses were higher than the other SGA recruiters, are false. The other SGA recruiter with the least seniority who started working the same day as Asmo, Jennifer Bowman, was paid about $5000 more than Asmo. Additionally, SGA recruiters' expenses were not tracked, and thus the expenses of the various recruiters were unknown. It is unclear how Santoro initially came up with these reasons for termination, but the fact that they were later eliminated, and they happen to be the two reasons that Santoro gave that are false, is very suspicious. It appears that Santoro offered any and all reasons he could think of to justify his decision to Asmo, whether or not they were true. Once a lawsuit was filed and Keane knew the reasons would be subject to scrutiny, it changed the justifications offered for Asmo's termination to include only those that were either circumstantially true or could not be as easily penetrated as false. This change in rationale is suspicious and is evidence of pretext.

In *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1999) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997), this court said "[i]n challenging an employer's action, an employee 'must demonstrate that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take the action it did) are not true.'" Here, Keane does not argue that each factor alone would not have independently resulted in Asmo's termination, but rather that the factors taken collectively resulted in Asmo's termination. Thus, in order to survive summary judgment, Asmo need not show that all of the factors articulated by Keane are false but rather, only that some of the factors are false and a mere pretext for discrimination.

Keane stated that a major reason for laying off Asmo was that her region had the lowest anticipated hiring needs in 2002 out of Keane's five recruiting regions. However, Asmo presented evidence that calls this statement into question and would allow a reasonable juror to conclude that this stated reason was pretextual. Santoro testified that after extensive research on his part, he determined that Asmo's assigned region (the midwestern region) had the least need for a recruiter like Asmo. Santoro talked with three group vice presidents about the anticipated hiring needs of their region: Gary Gindele, the vice president of the midwestern region; Gary Richard, the vice president of the western region (assigned to Bowman); and Gary Rader, the vice president of the northeastern region (assigned to Tom Becker). The record does not indicate, however, that Santoro had conversations with the regional vice presidents of Keane's two other regions, the southern region and the federal region, to access the anticipated hiring needs of those regions. Thus, there is no proof that Santoro was truly able to compare the hiring needs of Asmo's region with the needs of *all* of the other regions. This calls into question the validity of regional hiring needs being a legitimate reason for Asmo's termination.

Additionally, even if we consider only the conversations with the regional vice presidents that Santoro did have, the available evidence supports an inference that Santoro may have already decided he was going to lay off Asmo before he had those conversations. Rader testified that Santoro only had general conversations with him about his region's anticipated needs, without reference to the impending layoff decision or whether his recruiting needs could be met by sharing a recruiter. Further, Richard testified that Santoro talked with him about positions that were open, about Jennifer Bowman's performance, and about Bowman's importance to the western region's growth and success. Santoro did not, however, ask Richard about his region's anticipated hiring needs or whether the recruiting needs of his region could be shared. In contrast, when Santoro spoke with Gindele (the vice president of Asmo's region) he asked the following leading question: "[I]s it fair to say that you're not really projecting much new hiring in your area?" (J.A. 267). This evidence

further supports Asmo's claim that Santoro intended to terminate her all along and that he simply wanted to confirm his decision with others in the company.

Also calling into question Keane's claim that Asmo's region had the fewest anticipated hiring needs is evidence about the number of open positions in her region at the time of her termination. Asmo testified that at the time of her termination, there were five open positions in her region. It seems suspicious that a company would terminate a recruiter who was responsible for a region with so many openings. This is particularly odd given Asmo's notes, which said that in November 2001, just before her termination, Gindele stated that the midwest region's anticipated growth, and the testimony of Knauer, who at the time was the regional vice president of sales in the midwest region and who said that he was "concerned" about Asmo's layoff "because of the needs of the central region." (J.A. 13). This evidence alone cannot support Asmo's claim because neither side presented evidence about the number of positions open at the time of her discharge in other regions, but this would be an important point for further investigation upon remand.

The record also contains evidence that calls into question Keane's explanation for how and to what degree it considered job performance in the decision to terminate Asmo. Keane's layoff and hiring policy states that "[i]n determining which employees are to be affected by a layoff, consideration should be given to skills, business needs, performance history and employee tenure." (J.A. 69). However, Santoro said that he did not consider employee performance because each of the five SGA recruiters performed at good and similar levels and thus comparing their performances would not lead to conclusive results. However, SGA recruiter Tom Becker, who covered the northeast region, received two Quality Service Reviews (QSRs) that were critical of his performance. Quality Service Reviews are filled out by individual clients about the recruiter with whom he is working. Santoro testified that QSRs are not indicative of an individual recruiter's performance, and that they are only of "marginal [] importan[ce] to [him]." Nonetheless, Santoro did say that the QSR's provide a "snapshot" of the specific client's feeling about SGA recruiting at the time. However, it's difficult to understand why the QSR's are not useful tools for evaluating the performance of individual recruiters, since the client filling out the QSR would have worked directly with the recruiter about whom he filled out the QSR. This is also suspect given Jennifer Bowman's testimony that she believed the most important criterion in evaluating the performance of an SGA recruiter is "client satisfaction." (J.A. 259). If Keane did not emphasize client satisfaction as a major criterion for evaluation of performance to SGA recruiters, it's difficult to understand why such a recruiter would testify that she felt client satisfaction was the most important criterion in evaluating recruiter performance.

Finally, while the temporal proximity between Asmo informing Keane of her pregnancy with twins and Keane's decision to terminate her cannot alone prove pretext, *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)), temporal proximity can be used an "indirect evidence" to support an employee's claim of pretext. *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004).

All of this evidence taken together, considered under a summary judgment standard where we evaluate all evidence in the light most favorable to Asmo, indicates that Keane's stated reasons for terminating Asmo were pretext for discrimination.

### III. CONCLUSION

For the reasons stated above, we REVERSE the district court's grant of summary judgment for Keane and REMAND for further proceedings.

---------------

**DISSENT**

---------------

GRIFFIN, Circuit Judge, dissenting.  I respectfully dissent.  In this reduction-in-force case, Asmo has not satisfied the fourth element of the prima facie case of pregnancy discrimination, i.e., the *Barnes v. Gencorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), additional evidence requirement and a causal nexus between her termination and Keane's acquisition of knowledge of her pregnancy. Because plaintiff did not make out a prima facie case, there was no need for Keane to articulate lawful reasons for its adverse action.  Accordingly, we should not address Keane's stated reasons or Asmo's attempts to portray those reasons as pretexts for unlawful pregnancy discrimination.

The majority states that "the district court erred in holding that Asmo needed to present evidence beyond a nexus between her pregnancy and the adverse employment decision to satisfy the *Barnes* additional-evidence requirement . . . ."  But, the majority still effectively proceeds on the erroneous premise that temporal proximity alone can establish a causal connection between the protected activity and the unlawful employment action in the retaliation context.  As authority for this proposition, the majority cites *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) and *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000).  However, neither *DiCarlo* nor *Nguyen* stands for such a broad and unqualified proposition.  And neither *DiCarlo* nor *Nguyen* marshaled any binding precedent in support of such a holding.

The *DiCarlo* panel stated only that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."  *DiCarlo*, 358 F.3d at 421.  Such a statement is not a holding that temporal proximity *alone* can establish a causal nexus.  Moreover, in the instant case, Asmo's termination was not "acutely near in time" to Keane's learning of her pregnancy.  Thus, even if we read *DiCarlo* as the majority does, *DiCarlo* would not permit temporal proximity alone to establish a causal nexus here.

In any event, *DiCarlo* cites no binding precedent for the proposition that temporal proximity alone can establish a causal nexus in a discrimination case.  *DiCarlo* cites *Nguyen*, which does not and cannot stand for such a rule.  *DiCarlo* also cites *Brown v. ADS Computing Ctr.*, 519 F. Supp. 2d 1096, 1116 (S.D. Ohio 1981) for the proposition that "where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise."  *DiCarlo* correctly notes that the district court decision in *Brown* was affirmed by this court.  But *DiCarlo* inaccurately cites our affirmance in a format that fails to show that the affirmance was *unpublished*.  *See Brown v. Mark*, No. 81-3477, 709 F.2d 1499 (6th Cir. Mar. 3, 1983) (listed only as a one-line entry reading "Affirmed" in an Unreported Decision section of that volume of the Federal Reporter 2d).  Therefore, *Brown v. ADS* does not bind us any more than any other district court decision, which is not at all.  *See U.S. v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 423 n.10 (6th Cir. 2006).

*DiCarlo* also states "[v]arious of our sister Circuits have also accepted this concept," 358 F.3d at 421, but "this court is of course not bound by the holdings of our sister circuits." *U.S. v. Carpenter*, 360 F.3d 591, 600 (6th Cir.) (en banc) (citing *Nixon v. Kent Cty.*, 96 F.3d 1381, 1388 (6th Cir. 1996) (en banc)), *cert. denied*, 543 U.S. 851 (2004).[1]

----

[1]*See also DaimlerChrysler Corp. Health Care Benefits Plan v. Durden*, 448 F.3d 918, 923 (6th Cir. 2006) ("The cases are . . . not binding on this court because they are from other circuits."); *Cross Mountain Coal, Inc. v. Ward*, 93 F.3d 211, 217 (6th Cir. 1996) ("[E]ven though the decisions of other circuits are entitled to our respect, they are not

With regard to *Nguyen*, that panel stated only that "while there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an inference of a causal link], we do not hesitate to say that they have not been presented in this case." *Nguyen*, 229 F.3d at 567. Thus, *Nguyen* did not hold that temporal proximity alone can establish a causal nexus; it took care to qualify that "there *may* be circumstances" where such evidence would suffice. *Nguyen* effectively stated that, whether or not temporal proximity alone can ever establish a causal nexus under some circumstances, it was immaterial because Nguyen did not present such circumstances.

Therefore, *Nguyen*'s statement about "temporal proximity alone" was *obiter dictum*, i.e., "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential . . . ." BLACK'S LAW DICTIONARY 1102 (8th ed. 2004); *see also U.S. v. Yoon*, 398 F.3d 802, 806 (6th Cir. 2005); Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249 (2006). A panel's dicta, of course, does not bind subsequent panels. *See Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006) (noting that "dicta does not bind this Court"); *ACLU of Ohio v. Taft*, 385 F.3d 641, 649 n.4 (6th Cir. 2004) ("This statement is dicta and the decision is an advisory opinion, not binding on this court. Nor are we persuaded by similar non-binding dicta in . . . .").

Most important, the *Nguyen* decision relied upon by the majority also states that temporal proximity alone cannot suffice to establish a causal nexus:

> In both *Harrison* [*v. Metro. Gov't of Nashville*, 80 F.3d 1107 (6th Cir. 1996)] and *Moore* [*v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)], we found a causal connection when the temporal proximity was considered *along with other evidence of retaliatory conduct*. We have also spoken on the question of whether temporal proximity between the protected activity and the adverse action, in and of itself, is sufficient to establish a causal connection. *See Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986). *In Cooper, we rejected the proposition that temporal proximity is enough* . . . .

*Nguyen*, 229 F.3d at 566 (emphasis added).

Moreover, to the extent that *DiCarlo* or *Nguyen* could be read to state a holding that temporal proximity alone can be enough to establish a causal nexus, they conflict with, and must yield to, earlier published decisions. "'The prior decision [of a Sixth Circuit panel] remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Yoon*, 398 F.3d at 806 (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001)).

As a recent panel correctly stated, "temporal proximity itself is insufficient to find a causal connection . . . ." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (citations omitted). Rather, "a temporal connection *coupled with other indicia of retaliatory conduct* may be sufficient to support a finding of a causal connection." *Id.* (emphasis added); *see also Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) ("Temporal proximity, *when coupled with other facts*, may be sufficient in certain cases to establish the causal-connection prong in a Title VII case.") (emphasis added). As authority for these propositions, *Randolph* cited *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001) and *Nguyen* itself, 229 F.3d at 566-67, both of which pre-date *DiCarlo* (2004). "When a later decision from this court conflicts with its prior decisions, the earlier cases control." *Sowards v. Loudon Cty., Tenn.*, 203 F.3d 426, 431 n.1

---

binding upon us.") (citing *In re Tenn. Cent. Ry. Co.*, 498 F.2d 904, 905 (6th Cir. 1974)).

(6th Cir. 2000), quoted by *Slaughter v. Parker*, 450 F.3d 224, 252 (6th Cir. 2006) (Cole, J., dissenting).

In short, our earlier precedents require us to hold that temporal proximity alone cannot establish the requisite causal nexus between the employee's protected activity or status and the adverse action. *See also Balmer v. HCA, Inc.*, 423 F.3d 606, 610 (6th Cir. 2005) ("[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation [for] the discrimination claim."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) ("[T]emporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence . . . ."). Absent some other persuasive evidence of a causal nexus between Asmo's pregnancy and her termination, then, we may not consider whether the two events were "close enough" in time for the temporal proximity alone to support a finding of causal nexus. Asmo failed to satisfy the fourth element of a prima facie case of pregnancy discrimination, and summary judgment for Keane was proper.

The inquiry should end there, with no discussion of Keane's stated lawful reasons or Asmo's attempts to portray those reasons as pretextual. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) ("He therefore failed to make his prima facie case [of age discrimination] and we need not address the legitimate-reason and pretext parts of the *McDonnell* analysis . . . ."), *cert. denied*, 541 U.S. 1010 (2004).

Finally, even if our precedents permitted a plaintiff to satisfy the causal-nexus element with evidence of temporal proximity alone in a pregnancy-discrimination case, Asmo's claim still fails. I note first that the record does not establish with certainty when Keane learned that Asmo was pregnant. As the majority opinion notes, Asmo informed the Selling, General, and Administrative (SG&A) team of her pregnancy "sometime in October 2001," and Director of Corporate Recruiting Scott Santoro informed her of her termination on December 4, 2001. So the lapse between Keane acquiring knowledge and Asmo's termination could be as short as thirty-five days (October 31-December 4, 2001) or as long as sixty-four days (October 1-December 4, 2001).

In my view, the time period between Keane learning that Asmo was pregnant and its terminating her employment is insufficient, by itself, to satisfy the fourth element of the prima facie case. The majority cites no binding precedent holding that such a time lapse, without more, is sufficient to establish the additional-evidence requirement of *Barnes* and the requisite causal nexus between an employer learning of pregnancy and the adverse action. The majority cites one published decision, *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004), but that stands only for the proposition that on the facts of that case, a *substantially shorter* time lapse – twenty-one days – was sufficient to establish a causal nexus. *Cf. Hafford v. Seidner*, 183 F.3d 506, 519 (6th Cir. 1999) ("We agree with the magistrate judge that '[b]ecause the disciplinary actions occurred *two to five months after* Hafford filed charges, and are fairly even spread over a period of time, the inference of a causal connection based on temporal proximity alone is tenuous.' *Absent additional evidence, this loose temporal proximity is insufficient to create a triable issue*.") (emphasis added).

In the instant reduction-in-force case, I would likewise hold that, absent additional evidence, the loose temporal proximity, alone, is insufficient evidence to withstand defendant's motion for summary judgment.

For these reasons, I respectfully dissent and would affirm.