NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0037n.06

Case No. 20-1954

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JENA McCLELLAN,

    Plaintiff-Appellant,

v.

MIDWEST MACHINING, INC.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)

**FILED**
Jan 24, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

Before: SUTTON, Chief Judge; GUY and DONALD, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Plaintiff Jena McClellan appeals the grant of summary judgment to her former employer Midwest Machining, Inc., with respect to claims: (1) that she was discharged in violation of Title VII and the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e-2(a)(1) and 1981a; and (2) that she was paid lower commissions as an inside sales representative than an outside sales representatives in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).[1] After de novo review, we affirm.

## I.

Jena McClellan was hired as a telemarketer for Midwest Machining, a maker of component parts for complex tools and machines, and was quickly promoted to work as an inside sales

---

[1] Although McClellan's pregnancy discrimination claim was also asserted under Michigan's Elliott-Larsen Civil Rights Act, MCLA § 37.2101 *et seq.*, the district court declined to exercise jurisdiction over that state law claim and no arguments are raised with respect to it in this appeal.

representative starting in 2009 and continuing until she was fired on November 16, 2015. McClellan was recognized as a highly skilled salesperson and, by 2015, was a top performer among the three inside sales representatives. Yet, in 2014, Midwest's President Phil Allor created "Phil's Office Rules" to address "incivility" in the inside sales department that he largely attributed to McClellan.

The disparity between the commissions paid to the female inside sales representatives and the male outside sales representative and his supervisor was a sore point. McClellan said she asked Allor about outside sales, but was told that women could not be in outside sales or they would outsell the men and damage the morale of Sales Manager Greg Kirchoff. Finally, in May 2015, McClellan and fellow inside saleswoman Jessica Yoak organized a two-day "sick out" that caused Allor to raise the inside sales commissions to match the outside sales commissions for sales to new customers. Before that, inside sales representatives received 2% commission for such sales (or 1% for customers with discounts over 39%), while outside sales earned 3% commission for such sales (or 1.5% for customers with discounts over 39%). All "inherited" accounts generated 1% commission.

Tensions were stoked by an incident at the end of June 2015, which Allor concluded had been instigated by McClellan. In short, a piece of paper with "doodles" on it was taken from the trash can of the inside sales supervisor Jordan Fifelski by her newly hired subordinate Amanda Hammer. Hammer took that paper to Plant Manager Chris Childress, who had just laid off some employees due to slow sales, and accused Fifelski of wasting time and not working hard. Childress reported this to Allor, but Allor thought Fifelski was a hard worker and decided not to do anything. When the same thing happened a month later, it was McClellan who stirred the pot by telling Fifelski what Hammer had done. Hammer, in turn, said McClellan had put her up to it.

Allor quietly took over direct supervision of inside sales because Fifelski refused to continue doing it. But Allor chose not to question McClellan or take any other action due to slumping sales.

On August 19, 2015, McClellan announced to her coworkers that she was pregnant. McClellan testified that Fifelski's attitude turned jealous and resentful. Fifelski was also short with the rest of the inside sales team. McClellan testified that Kirchoff said something about being "barefoot and pregnant" and made a comment about her new child having a different father than her other children. On October 15, Allor asked McClellan what her plans were for maternity leave because he was concerned he might lose a great salesperson. McClellan admitted that Allor was relieved to hear that she definitely planned to return to work full-time. During McClellan's annual review on November 5, Allor said they should finalize her maternity leave plans and again expressed relief that McClellan "was coming back." McClellan received an excellent performance review, although she got a smaller raise than she had expected.

Apart from that annual review, other events during the first week of November are relevant. Allor assigned McClellan a research project into potential customers for bridge bushings, which she testified she completed. Allor announced that the year-end sales promotion—the D30 initiative—would be the primary focus of calls beginning Monday, November 9, and lasting into early December. Then, on Friday November 6, Hammer quit her inside sales job and McClellan made a last-minute request to take vacation the following week. Two calls between Allor and McClellan occurred on November 6.

First, according to McClellan and the notes she was apparently keeping about incidents at work, Allor called her "in a panic" about Hammer quitting; McClellan complained about Fifelski, whom she learned was no longer her supervisor; and Allor was upset when McClellan "put in for the following weeks vacation" and questioned her loyalty, but "gave [her] the week off."

McClellan says Allor had her transfer the call to Jennifer Anderson to approve the leave request—while Allor denied that he did so, and Anderson testified that she did not sign McClellan's leave request. Allor's account of that first call differed materially from McClellan's: Allor testified that he denied her vacation request, told her that the company could not spare her, and warned that her job would be in jeopardy. Allor decided that he would fire McClellan if she did not come to work the following week, but he was not certain he had been clear enough with McClellan.[2]

Allor called McClellan a second time on November 6. Allor says he told McClellan that "if she took the time off, report to my office immediately upon her return and we will discuss whether [she] still ha[d] a job." Allor added that McClellan asked if that meant she would be fired, to which he answered, "very likely." Indeed, McClellan's own notes recounted: "Two hours later [Allor] called back and threatened my job." Although McClellan testified that she did not think Allor would actually do it, there can be no question that she understood her vacation was not approved. Nevertheless, she did not report to work the week of November 9.[3]

That next week, Yoak told Anderson—who told Allor—that McClellan had encouraged a mass resignation of the inside sales representatives. Yoak said she did not quit because she realized that McClellan had requested vacation time instead of quitting. Allor and Anderson believed McClellan was trying to thwart the D30 Initiative and take over the others' accounts when they

---

[2] As it turns out, Midwest had an unsigned copy of McClellan's leave request and McClellan was never able to produce the signed copy she thought she had in her files. Anderson testified that she kept the unsigned original.

[3] McClellan testified that she asked for leave in part because her son had threatened self harm, but she conceded that she did not tell anyone this at the time and told Allor only that she had an invitation to go out of town.

quit. McClellan testified that neither was true, claiming that she had actually talked her coworkers out of quitting earlier that fall.

On Monday, November 16, Allor met with his managers and they agreed with his decision to fire McClellan. Allor also decided to close the inside sales department and move Yoak into another role. Once McClellan arrived, she was called into Allor's office and presented with a severance agreement containing a release of claims and promising payment of $4,000 in eight weekly installments. McClellan signed under pressure and accepted all of the payments before filing suit. In the prior appeal, this court held both: (1) that the "tender back" rule did not apply to claims brought under Title VII or the Equal Pay Act; and (2) that, in any event, McClellan had effectively tendered back the payments by sending a check within a "reasonable time after learning of her rights." *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 303, 310 (6th Cir. 2018) (remanding for further proceedings), *cert. denied*, 139 S. Ct. 2691 (2019); *but see id*. at 311-15 (Thapar, J., concurring in part and dissenting in part).

On remand, Midwest renewed its motion for summary judgment. *See McClellan v. Midwest Machining, Inc.*, No. 1:16-cv-1308, 2020 WL 6144677 (W.D. Mich. Sept. 25, 2020). The district court concluded that McClellan's pregnancy discrimination claim failed because she had not shown a question of fact on the issue of pretext. As for the Equal Pay Act, the district court found McClellan could not make a prima facie showing of wage discrimination because the inside and outside sales positions did not involve "substantial equality of skill, effort, responsibility and working conditions." McClellan has appealed both determinations. The district court also rejected Midwest's invitation to dismiss on the basis of the severance agreement, but added that the issue was of no consequence because the claims fail on their merits. Midwest not only renews this argument on appeal, but also urges us to revisit the court's decision in the first appeal. Generally,

for prudential reasons, this court will not reconsider questions actually decided in an earlier appeal absent exceptional circumstances. *See Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017). Here, we see no need to revisit our prior decision about the "tender back" rule because McClellan's claims do not survive summary judgment on the merits.

## II.

We review a decision granting summary judgment de novo, considering the facts and inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the moving party demonstrates the basis for its motion, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one which "might affect the outcome of the suit under the governing law." *Id.*

## A.

Title VII, as amended by the Pregnancy Discrimination Act, prohibits sex discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). In the absence of direct evidence that she was discharged because she was pregnant, McClellan sought to prove pregnancy-based discrimination under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1353 (2015); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).

The first step of that framework requires a plaintiff to present a prima facie case of discrimination. In the context of pregnancy discrimination, McClellan can meet her initial burden by showing: "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. The district court made no findings on those elements because "Midwest [did] not contest that McClellan had established a prima facie case." Midwest now argues that the required nexus cannot be established because there was nearly a three-month gap between McClellan's first announcement of her pregnancy and her discharge.

While the fourth element may be satisfied where there is temporal proximity, that is not the only way to establish the required nexus. *Asmo v. Keane, Inc.*, 471 F.3d 588, 593-94 (6th Cir. 2006); *see also Kubik v. Central Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 581-82 (6th Cir. 2017). Generally, however, "arguments raised for the first time on appeal are forfeited." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015). Among the reasons for this practice is that it "ensures fairness to litigants by preventing surprise issues from appearing on appeal." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). We see no compelling reason to consider this argument where Midwest expressly "assumed that McClellan established a prima facie case of pregnancy discrimination." (PageID 430.) We assume, as the district court did, that McClellan could make this initial showing.

That being the case, the burden of production shifts to Midwest to articulate a legitimate non-discriminatory reason for its decision to terminate McClellan's employment. *See Cline*, 206 F.3d at 658. Midwest repeats four allegedly independent reasons justifying her termination—insubordination, sabotage, misconduct, and lack of work. But the district court looked no further than the asserted insubordination in finding that Midwest had met its burden. Indeed, Allor

testified that he told his managers that he decided to fire McClellan because he had given her the option of "coming in [the] next week and keeping her job[,] or not coming in and putting her job in jeopardy" and "[s]he chose the latter." The implication being that if she had come in, she would not have been fired. Midwest seems to acknowledge as much on appeal.

Once Midwest proffers a legitimate non-discriminatory reason, it is up to McClellan, who retains the burden of proof at all times, to marshal sufficient evidence from which a jury could reasonably conclude that the reason was merely a pretext for pregnancy discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 519 (1993). That is, McClellan must "produce sufficient evidence from which a jury could reasonably reject [Midwest's] explanation of why it fired her." *Chen v. Down Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citation omitted). Pretext is typically shown with evidence that the employer's non-discriminatory reason: (1) had no basis in fact, (2) did not actually motivate the discharge, or (3) was insufficient to motivate the discharge. *Id.* Although these are not the only ways to establish pretext, these categories are a convenient way of focusing the evidence on the question of pretext. *See Miles v. So. Central Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).

McClellan contends that there is a disputed question of fact whether the written leave request form she submitted on November 6 was approved and signed by Anderson. McClellan testified that it was signed and returned to her. (PageID 705-06.) Anderson testified that Fifelski brought it to her, but she did not approve it and kept the unsigned original. (PageID 831-32.) The district court found McClellan's account could not be believed because it was blatantly contradicted by the fact that Midwest produced the only copy and it was not signed. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). McClellan speculated that she did not have a signed copy any longer because someone must have taken it from her desk before she was fired. While this claim falls short of evidence sufficient to lead a reasonable jury to believe her, it is nonetheless irrelevant because the *material* question is not whether the form was signed by Anderson. It is, rather, whether McClellan was insubordinate when she took the requested leave despite Allor's verbal warning that her job would be in jeopardy if she did.

In that regard, there were conflicting accounts of what was said during the first call between Allor and McClellan on November 6. They do agree, however, that Allor was upset that McClellan was asking to take the following week off when Hammer had just quit and follow up on the D30 sales promotion was about to start. McClellan says Allor was upset and questioned her loyalty in requesting leave, but that he approved it and had her transfer the call to Anderson. By Allor's account, however, he told McClellan that they could not spare her the following week and denied the request. Yet, Allor was not sure he had been clear enough, so he called McClellan a second time on November 6. In that call, according to McClellan and the notes she was keeping, Allor threatened her job if she took the time off. McClellan did not think he actually would fire her, but no reasonable jury could conclude that the asserted insubordination was without factual basis. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326-27 (6th Cir. 2021) ("To show pretext on the ground that the reason for termination had no basis in fact, a plaintiff 'must provide evidence that the employer's allegations never happened.'" (citation omitted)).[4]

---

[4] Nor is this a case in which the employer offered shifting rationales for the termination that could be evidence of pretext. *See Pelcha*, 988 F.3d at 327-28. Although Midwest offered more than one reason to support its decision, providing "additional, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *Id*. at 328 (quoting *Miles*, 946 F.3d at 891).

Next, McClellan seems to argue that there was evidence that the asserted insubordination did not actually motivate her discharge. *See Chen*, 580 F.3d at 400. Disparate treatment evidence can establish pretext by showing "that other employees, particularly employees outside the protected class, were not disciplined or discharged even though they engaged in substantially identical conduct to that which [the employer] contends motivated the discipline or discharge of the plaintiff." *Miles*, 946 F.3d at 893 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)). McClellan faults the district court's assessment that "none of the vacation requests submitted in support of McClellan's position are 'substantially identical'" to hers. The shorthand of "substantially identical conduct" may be more fully described as having "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Pelcha*, 988 F.3d at 328 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

The district court rejected McClellan's reliance on evidence that no one else was fired "for not giving timely notice of vacation" or without "weeks or more advance notice" as was required by Midwest's policy. (Br. pp. 42, 43.) The other employees' conduct was not substantially identical to McClellan's, most fundamentally, because Midwest did not claim McClellan was discharged because her request was *untimely*. She was discharged because she took off the week despite being warned that her job would be in jeopardy if she did. That is, it was her insubordination—not the lateness of her request—that Midwest articulated as the reason for her discharge.

Finally, McClellan argues that a reasonable jury could infer from other circumstantial evidence that pregnancy discrimination actually motivated her discharge. Starting with comments made to her after she announced she was pregnant, McClellan says Kirchoff made a sexist

statement about her being "barefoot and pregnant" and asked if the child would have a different father than her other children. McClellan also alleged that Fifelski became cold, jealous, and resentful. Apart from evidence that there was another source of contention between them, Fifelski's alleged remarks indicated that she was jealous of McClellan's "perfect life." These remarks were not made in connection with the discharge or by the decisionmaker, although they both apparently concurred in Allor's decision. "[D]iscriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination," although "[c]ircumstantial evidence . . . of a discriminatory atmosphere . . . may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Asmo*, 471 F.3d at 595 (quoting *Ercegovich*, 154 F.3d at 356).

Relying on circumstantial evidence of a sexist atmosphere at Midwest, McClellan argues that the sales force was segregated by sex, at least while she worked there, where all three inside sales representatives were women and the outside sales representative and his supervisor were men. McClellan says Allor told her: "Women cannot be in outside sales [because] they will outsell the men any day." This is not a failure to promote case, however, so McClellan is arguing that this suggested Allor "likely had a traditional view that pregnant mothers should stay home or really want to stay home and wouldn't be good employees after a pregnancy." (Br., p. 44.) The comment may be sexist, as Allor allegedly said he wanted to avoid damaging Kirchoff's "morale." What cannot be said, however, is that the evidence allows an inference that Allor was inclined to discriminate against pregnant employees. In fact, Allor thought highly of and accommodated Fifelski's pregnancies and allowed Fifelski to work from home part-time. Most tellingly, however, McClellan herself conceded that she was not aware of anyone (other than herself) whom she thought was "treated unfairly because of a pregnancy or maternity leave."

Nor could a reasonable jury infer animus toward McClellan because she was pregnant from evidence that Allor, who was the decisionmaker, did not congratulate her on the news. Even cursory review of the facts in *Asmo* reveals that McClellan's reliance on it for this proposition is misplaced. In short, Asmo's supervisor, Santoro, learned during a conference call that Asmo was pregnant with twins. Although she was met with congratulations by everyone else, Santoro made no comment and moved on to the next order of business. Santoro then studiously avoided mention of Asmo's pregnancy in the weekly calls that followed and terminated her employment a few months later. *Asmo*, 471 F.3d at 594-95. This court explained that Santoro's silence was evidence of pretext because it could be read as his speculation or assumption about how Asmo's pregnancy with twins would interfere with her particularly demanding job. *Id*. This case is not remotely similar—the undisputed evidence was that Allor asked McClellan about her maternity leave plans when he learned of her pregnancy and expressed concern about losing an excellent salesperson. Allor was relieved when McClellan assured him that she planned to return to work. Maternity leave plans were raised during McClellan's subsequent performance review, and Allor again expressed relief that McClellan would be coming back to work.

McClellan has not marshalled sufficient evidence from which a jury could infer that the insubordination was merely a pretext for pregnancy discrimination. As this court reiterated in *Miles*, "an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Miles*, 946 F.3d at 886 (citation omitted). The district court did not err in granting summary judgment to Midwest on McClellan's pregnancy discrimination claim.

**B.**

The Equal Pay Act prohibits wage discrimination on the basis of sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In contrast with Title VII, "proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) (citation omitted). The EPA's burden-shifting scheme also differs from Title VII in that "a defendant bears both the burden of persuasion and production on its affirmative defenses." *Id*. at 364-65. The district court found that McClellan's claim failed at the prima facie stage, and we agree.

To make a prima face case of wage discrimination under the EPA, McClellan must show that Midwest paid "different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)). McClellan compares her job in inside sales to the job performed by a male employee, Alan Wierzbicki, who was promoted to outside sales in 2011. To the extent McClellan's claim is that Wierzbicki was less qualified or less skilled than she was, that is not the question for purposes of a prima facie case under the EPA. The task is to compare the jobs they performed, "showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." *Beck-Wilson*, 441 F.3d at 362-63 (quoting *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992)). "Factors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Id*. at 363 (citation omitted).

There was evidence that McClellan's job paid less than Wierzbicki's job; but there was also ample evidence that their jobs were not substantially equal. In making that determination, "our focus is on actual job requirements or duties, rather than job classifications or titles." *Id.* at 362 (citing *Brennan v. Owensboro-Daviess Cmty. Hosp.*, 523 F.2d 1013, 1017 & n.17 (6th Cir. 1975)); *see also Carey v. Foley & Lardner LLP*, 577 F. App'x 573, 578-80 (6th Cir. 2014). Thus, it is not the title of "inside sales" or "outside sales" that is determinative. Nonetheless, by McClellan's own account, there were a number of important differences between the skill, effort, responsibility and working conditions required for their jobs.

Specifically, as the district court summarized: (1) "the inside sales team sells via telemarketing, while outside [sales] sells via face-to-face contact"; (2) "the inside sales team works out of Midwest's office, while the outside sales team works on the customer's premises"; (3) "the inside sales team has 'virtually no' travel, while the outside sales team travels extensively"; (4) "the inside sales team is directly supervised[,] while the outside sales team is minimally supervised"; (5) "the inside sales team's workflow is computer driven, while the outside sales team's workflow is self-driven"; and (6) "the inside sales team performs extensive cold calling, while the outside sales team does minimal cold calling." Without contesting that there were these differences, McClellan points to a notation on one of Wierzbicki's performance reviews that indicated a need to improve in the area of "inside sales." Wierzbicki explained that he was being asked to make more calls to customers to set up visits and keep in contact with those customers who were not visited as much. (PageID 853.) The fact that Wierzbicki did, or was expected to make some calls from the office, however, does not make the jobs comparable for purposes of the EPA. The jobs were not substantially equal.

In fact, consistent with the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1), Midwest's inside sales positions were paid hourly (and entitled to overtime), while Wierzbicki's outside sales position was "exempt" and salaried. McClellan agreed that the higher salary paid to outside sales positions was justified. Conceding as much again on appeal, McClellan argues only that the difference in commissions paid for new customers was unjustified. To be sure, Midwest chose to level the commission schedules when pressured by a two-day sick out. That did not make their jobs substantially equal: "Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" *Beck-Wilson*, 441 F.3d at 359 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)).

The district court did not err in finding McClellan failed to make a prima face case of wage discrimination in violation of the EPA.

*       *       *

The district court's entry of judgment in favor of Midwest is **AFFIRMED**.