**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0494n.06

No. 12-1330

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*May 16, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TAIMI MEGIVERN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| GLACIER HILLS INCORPORATED | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE: COOK, WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Following the termination of her employment, Plaintiff-Appellant Taimi Megivern ("Megivern") sued her former employer, Defendant-Appellee Glacier Hills, Inc. ("Glacier Hills"), alleging that her employment was unlawfully terminated on the basis of her pregnancy and that Glacier Hills interfered with benefits due her under the Family Medical Leave Act ("FMLA") and the Employee Retirement Income Security Act ("ERISA"). Megivern appeals the district court's grant of summary judgment to Glacier Hills on all of her claims. We AFFIRM.

**I.**

Megivern worked at Glacier Hills from August 14, 2007 until her employment was terminated on May 26, 2010. Glacier Hills is a non-profit senior-living facility in Ann Arbor, Michigan with approximately 500 employees, of whom approximately 90–95% are women.

Megivern worked as a Recreational Therapy Programmer, and her duties included planning and supervising activities for Glacier Hills residents, completing resident assessments, and attending care conferences. On August 13, 2009, Megivern's department changed names from the "Recreational Therapy Department" to the "Life Enrichment Department," and Megivern's title was changed to "Life Enrichment Coordinator" ("LEC"). As a LEC, Megivern's responsibilities remained substantially the same, but instead of working to coordinate resident activities for the entire Care and Rehabilitation Center, she was assigned a specific unit.

Megivern received her first performance evaluation on February 21, 2008. Her supervisor at the time, Marcia Kirk ("Kirk"), rated her as "meets standards" in all categories of the evaluation with the exception of two categories related to Megivern's interactions with residents where Kirk rated her as "consistently exceeds standards" and "far exceeds standards." Megivern received positive comments from Kirk such as, "Taimi is very giving to the residents," and "[d]ocumentation with assessments . . . is excellent."

Megivern's next performance evaluation was completed on June 4, 2009. Although Megivern continued to receive a "meets standards" evaluation in most categories, she received a "partially meets minimum standards" under "positive ambassador" to co-workers. Kirk noted that "Taimi is influenced by others and allows peer pressure to create negative attitudes tow[a]rds co-workers. When Taimi's attitude becomes negative it impacts her relationships with her co-workers and supervisor," and listed "remove personal feelings and

attitudes towards co-workers when working as a team player" as a goal for Megivern in the upcoming year.  The remainder of Kirk's comments were positive, expressing that "Taimi is an asset to the Recreational Therapy Department" with "excellent skills for planning" and "creative" ideas.

Megivern did not agree with Kirk's evaluation, and wrote responses in many of the evaluation categories.  For example, in the box marked "Provides a caring, respectful environment," Megivern wrote "It is sometimes difficult in a non-harmonious atmosphere."  Megivern spoke to her co-workers about her evaluation and asked them for their impression of her performance, "kind of" hoping to prove Kirk wrong.  Megivern met with Kirk to discuss the evaluation and described the meeting as "like a little storm" that "wasn't necessarily a happy [discussion]."  Megivern also wrote her own evaluation and sent it directly to Ray Rabidoux, CEO of Glacier Hills, Gerie Greenspan, Director of Advancement, and Kim Thompson ("Thompson"), Executive Director of the Care and Rehabilitation Center.

In August 2009, Glacier Hills removed Kirk as Megivern's supervisor and replaced her with Stacy Kudlak ("Kudlak").  At her deposition, Kudlak testified that Thompson hired her because she was dissatisfied with the department, and told Kudlak that she would "probably have to get rid of the whole department."  Kudlak elaborated that although this was Thompson's expectation for the department, Kudlak wanted to give each of the employees a chance.

As part of the departmental change, Megivern was moved to the "Two South" unit where she was responsible for 45 residents. This was the largest unit, and Megivern had more resident assessments to complete than any other employee. Glacier Hills required that LECs complete state-mandated resident assessments within two to three days of the resident's admission into the facility. These resident assessments covered the resident's interests, personal history, and hobbies, and LECs used them to complete a care plan for each resident. The time it took to complete an assessment varied from half an hour to slightly more than an hour, depending on the resident. LECs were also responsible for running two group activities for their residents each day, and for recording which residents participated in the activities.

Megivern began having trouble with her job as soon as she moved to the Two South unit. She felt that she could not complete all of her work each day, had blisters on her toes from walking, and fell behind in completing her assessments. Megivern testified that other LECs felt that they did not have enough time to complete the assessments. She disagreed with Kudlak's management approach, considered herself more qualified to manage the department, and began keeping a "log" of Kudlak's practices that she found objectionable. Kudlak was dissatisfied with Megivern's performance as well. Kudlak testified that Megivern "moped around," did not have much "purpose to her step," "took lots of smoke breaks," was "lazy," avoided accountability for her actions, and could be argumentative.

Shortly after she started working in the Two South unit, Megivern told Kudlak that her workload was unmanageable. On October 23, 2009, Kudlak emailed Megivern to remind her to enter each resident's activities into the computer because she noticed that one of Megivern's residents was never entered. Megivern apologized and expressed that she constantly felt behind in her work, writing: "I am only one human and sometimes it feels like I would need 10 or 11 hours in a day in order to feel like I'm 'on top of things.'" Megivern asked Kudlak if it was possible to hire two new LECs in order to more evenly distribute the workload. Kudlak responded by offering Megivern five hours of overtime each week until the department was fully staffed. Kudlak asked Megivern how many assessments she was completing each week and told Megivern that "I don't want you to feel overwhelmed and am open to working together to solve the issue." She suggested that Megivern prioritize her daily resident activities first, with assessments coming second, and all other activities as a last priority. Kudlak expressed a willingness for future communication: "Let's just keep the lines of communication open and do our best. I appreciate ALL of your efforts, and I know the resident[s] do too."

In mid-October 2009, Kudlak began requiring the LECs to send daily emails reporting the number of participants in each of their activities. Megivern followed this directive for awhile, but came to believe that she was the only one sending daily reports to Kudlak. She decided to stop sending her numbers to Kudlak and wrote her an email declaring her intent. Kudlak never replied to Megivern's email, but on November 11, 2009,

wrote Megivern to express her discontent with the resident participation level for Megivern's activities. Kudlak directed Megivern to schedule two specific resident events, and gave her instructions to "help . . . with ideas." Kudlak told Megivern that obtaining resident participation was "all about approach, planning and energy" and told her to "[s]ee me if you need tips."

Kudlak conducted an audit of each LEC's assessments and held a team meeting with the LECs on February 11, 2010. At this meeting, Kudlak told each team member areas that they needed to change or correct. Kudlak testified that Megivern was not the only LEC with deficiencies in her paperwork, and it was a "common occurrence" to find incomplete care plans for other LECs. She instructed Megivern to complete a new assessment and care plan for a resident who had not had a new care plan since 2006, however, Megivern did not complete this new care plan as directed.

On February 22, 2010, Megivern applied for a transfer within Glacier Hills to a position as a "Resident Centered Care Program Manager." Megivern asked Kudlak to complete a section of the application that called for supervisor comments on Megivern's job performance. Kudlak wrote: "Taimi's job performance is average. During her work day she presents as sullen and unenthusiastic. Her attendance is good. I hear positive responses from residents about her interactions with them." Megivern's application was rejected.

Megivern sent Kudlak an email on April 3, 2010 expressing dissatisfaction with her pay and holiday schedule. Megivern told Kudlak that she was scheduled to work four

holidays over the upcoming year, and that many other employees were only working two holidays. She further told Kudlak that given her seniority at Glacier Hills, it was not fair for her to work more holidays than other employees. Megivern told Kudlak that she had heard from a departing employee that the employee was paid more than Megivern. Megivern asked Kudlak to "assure" her that "everyone in our department is paid equitably and fairly, considering their amount of time here."

On April 2, 2010, Megivern learned that she was pregnant and announced the news to her coworkers on April 5, 2010. Megivern testified that Kudlak was present when she announced the news of her pregnancy, but Kudlak claims that she learned about Megivern's pregnancy from another LEC shortly after Megivern announced her news. Everyone congratulated Megivern, and when she discussed her pregnancy with Kudlak, Kudlak congratulated her, gave her a hug, and told Megivern stories about her own pregnancies and the difficulties that she had. Megivern testified that Kudlak seemed happy and expressed excitement on the surface, but that in hindsight she believes that Kudlak was unhappy and foresaw Megivern's upcoming absence as a "big burden." Megivern does not recall ever telling Thompson about her pregnancy in person or over the phone. At some point Thompson learned of the pregnancy from Kudlak, but never discussed Megivern's pregnancy with her because she does not "do that for any employee." Megivern learned that she was pregnant with twins and told Kudlak on April 27, 2010. Kudlak responded, "TWINS! That is so exciting!" and communicated the news to Thompson in early May.

Megivern left for vacation from April 7 to April 15, 2010. During this time, Kudlak took over Megivern's responsibilities and noticed that Megivern had not completed certain tasks. Kudlak audited Megivern's charts and discovered numerous errors, prompting her to talk with Thompson about the issue and send Megivern an email on April 13 outlining her concerns. Kudlak listed the following problems: (1) there was no assessment or care plan for four residents, (2) the care plan and assessment that Kudlak had requested in February had not been completed, (3) there was no quarterly progress note for one long-term resident, and (4) there was no system in place for notifying Megivern when a long-term resident's quarterly reports were due. Kudlak expressed frustration that Megivern had not followed through with the directive she had given her in February, writing: "I noted that this needed to be done on February 11th at the team meeting. What happened with this? I count on you to follow through with job responsibilities I outline. I normally don't check to assure things I ask for are completed but from now on, please just give me a copy so that I know follow through has been completed." Two days later, Kudlak responded to Megivern's questions about pay and holidays, suggesting they meet to discuss Megivern's concerns.

Megivern responded to both emails on April 15. Megivern began her email by noting that she was "trying to catch up on lots of paperwork" and expressing that she would prefer if Kudlak would only correspond with her via email because she did not "feel like I have ANY spare time to discuss those things." Megivern explained that she had completed some of the tasks Kudlak mentioned in her email and that for others, circumstances beyond her

control (such as the health of a resident) made completing the assessment an impossibility. She conceded that she made a mistake on the chart from February by "not doing it exactly how you wanted," but explained: "Sometimes, when information is given to us a while ago and I haven't had reason to use it very often . . . it falls in the cracks." Megivern cautioned that "with fewer hours than ever, **\*mistakes are bound to happen\***." (emphasis in original). She further conceded that she had not given any thought to instituting a reminder system for long-term residents, but explained:

> It may take me some time to figure out a good system, and frankly, I don't feel often that I have **\*time\*** to think about these things!! . . . please know that if *everything* takes priority (especially after just getting back and having a lot to catch up on), some things will naturally take the back burner until I can find the time.

(emphasis in original). Megivern sent a second email to Kudlak on April 16 re-emphasizing that she preferred to be communicated with by email "so that there is no misunderstanding later about what was communicated."

On April 19, 2010, Kudlak met with Megivern, issued her a written "Employee Warning Notice," and placed her on a "Performance Improvement Plan" ("PIP"). The warning notice specified "Inadequate Job Performance" as its motivating reason, and noted that an audit of Megivern's charts on April 15, 2010 revealed a 70% paperwork completion percentage. Kudlak further noted that Megivern's paperwork was "out of compliance with State guidelines" and that Megivern had made "no attempt to complete [a certain assessment] at all," despite Megivern's assertions to the contrary.

The PIP specified three job duties that Megivern "performed below acceptable standard[s]:" "Completion of Initial Recreation History and Assessment Forms," "Completion of Recreation and Assessment Forms and [C]are [P]lans on an [A]nnual [B]asis", and "Care Plans." The PIP advised that "an average of 2 assessment[s] must be completed each work day. When you are not running a scheduled activity, your next priority should be your paperwork." Further, the PIP directed Megivern to "Watch number of breaks (each employee is to have 2 15 minute breaks per day), and to "watch time spent talking with colleagues." Kudlak instituted the PIP for one month, during which time Megivern would meet with Kudlak weekly to discuss her progress.

Kudlak's notes from this meeting reflect that Megivern raised other issues. Megivern voiced her concerns about working on holidays and whether she was being paid a fair wage for her work. Kudlak responded by referring her to human resources and reviewing the coming year's schedule to ensure that Megivern was not working more holidays than other employees. Megivern raised other concerns with Kudlak, including that volunteers in the department took up too much of her time, that Megivern was "running" all the time and had a blister on her toe, and that she did not have enough time to complete her daily tasks. Megivern told Kudlak that she had been keeping "extensive notes" on Kudlak's behavior and threatened to share them with Ray Rabidoux, the CEO of Glacier Hills. Megivern told Kudlak that she was more qualified than Kudlak and that she should have been hired for Kudlak's job.

Megivern wrote an employee's statement responding to her written warning and sent this statement to human resources on April 19, 2010. She expressed the view that Kudlak's warning was "retaliation against me for daring to speak my mind to her." Megivern wrote that Kudlak ignored her frequent protestations that the workload was too much, and that many other LECs were also behind on their paperwork. Megivern disputed Kudlak's assertions that certain assessments were missing from residents' files and reiterated that "mistakes are bound to happen." She argued that:

> A simple verbal warning would have sufficed in this situation, but it seems that every little mistake is needed in order to make me look like a bad employee. . . . Stacy's goal is clearly to fire me, and she is looking for every available opportunity to do so, and it's frankly unfair. . . . The Human Resources Department should expect to see more about me from Stacy, I am sure, as she spends valuable company time micro-managing me and seeking out any and every opportunity to make me look like a substandard employee. I urge Human Resources to take note of such people, as they are not good for the organization's morale.

The following day, Megivern wrote a lengthy email to Thompson raising similar complaints. After noting that she understood that Kudlak and Thompson were "connected . . . on a personal level," Megivern continued:

> Though you have not bothered to ask me how things are going under [Kudlak's] direction (after promising our department we would "*love*" her), I feel the time has come for me to highlight only a few (of many) issues that I have witnessed under her leadership. I have been keeping ongoing notes about her performance as Life Enrichment Manager over the past several months, with the assumption that it would be passed along to you at some point.

Megivern repeated her understanding that Kudlak was retaliating against her for complaining about Kudlak's management style and performance. The email is divided into sections addressing the following areas of concern: "Lack of concern for residents and family," "Budget," "Professionalism," "Scheduling," "Fairness," and "Incompetency." For example, Megivern raised concerns regarding Kudlak's professional skills:

> Her written skills are questionable. For time's sake, I will not try to quote her here, but I have saved emails which show that she lacks basic understanding of the English language. Examples would include putting a question mark where a period belongs and vice-versa, not to mention basic spelling errors. Given that it can be hard to believe that somebody lacking such basic written skills could make it through graduate school, Stacy's credentials should be posted for all to see and read.

Megivern "evaluate[d]" Kudlak as a "very poor manager" and, although she thanked Thompson for taking the time to read her concerns, she noted again that Thompson was likely to sympathize with Kudlak given their close relationship. Megivern ended her email by requesting that Thompson only respond via email for two reasons: (1) Megivern is very busy at work, and (2) email leaves no room for miscommunication. Megivern noted that she made this same request to Kudlak, but that Kudlak did not honor the request.

Kudlak held her first progress meeting with Megivern on April 26, 2010. Kudlak's notes reflect that Megivern still had not updated a resident's progress notes as asked of her at the February 11, 2010 meeting and as reflected in Megivern's PIP. Megivern responded that she "really didn't have time to review the PIP." When Kudlak found numerous "holes" in two residents' paperwork, Megivern responded that "things fall through the cracks."

Megivern and Kudlak met again on May 3, 2010. Kudlak noted that Megivern was three assessments behind and had failed to complete an annual assessment that was due on March 4, 2010. Megivern responded that she did not have enough time to complete the assessments. Kudlak also discussed new job responsibilities that Megivern would have to take on because of another LEC's departure. Megivern responded that she would "do her best" but that "time is a factor." Kudlak reminded Megivern that on May 1, she had decreased Megivern's responsibility for daily resident activities to one per day, and that this should give her additional time to catch-up on her work.

Kudlak's next meeting with Megivern was May 11, 2010. Megivern was now eleven assessments behind schedule. Megivern gave Kudlak an assessment and care plan for a resident, but Kudlak returned it to Megivern because she had not drafted a new plan as required, rather she had updated an old plan from 2006. Megivern announced that her due date was November 18, 2010 and that she would not be able to work on Thanksgiving. Kudlak responded that she would reschedule Megivern accordingly. Kudlak believed that Megivern had not successfully completed the PIP, but had not made a decision regarding whether to terminate her at this point.

During the May 11 meeting, Megivern asked about disability and FMLA benefits, and Kudlak referred her to human resources. The next day, Kudlak emailed Thompson and Kim Cybart, a manager in the human resources department, to tell them that she offered to increase Megivern's hours and that Megivern responded, "Well, it depends on my energy,

it takes all I can to get here every day but I'll do my best."  Cybart replied to Kudlak and

Thompson:

> We may need to suggest she start using FMLA if she can't meet the full-time schedule.  If she comes back to you and says she 'doesn't have the energy to work 80 hours,' let me know.  We may have her meet with HR to discuss FMLA and how it will be applied to her schedule.

On May 13, 2010, Megivern met with Trisha Schauer, a human resources

representative, to discuss short-term disability benefits and her FMLA rights.  Megivern

asked Schauer about short-term disability benefits and FMLA leave and told Schauer that she

was pregnant with twins and would need to utilize maternity leave at some point in the

future. Megivern testified that she was investigating what her options were and "was putting

my feelers out . . . to try to plan."  Megivern did not specifically request to use her FMLA

benefits or identify a date on which she wanted to start her leave.  Schauer testified that her

meeting with Megivern was informational in nature and that she did not anticipate Megivern

taking leave until a "very futuristic date . . . five, six, seven months down the road."

The next day, Thompson approached Megivern and told her that she needed to see

her. Thompson testified that she wanted to talk with Megivern about her PIP, the email that

Megivern sent following her warning, and how Megivern felt about her progress.  Megivern

and Thompson scheduled a meeting for after lunch; however, after thinking about her

schedule, Megivern emailed Thompson to tell her that she was too busy to meet.  Megivern

also reiterated her preference for email communication:

Kim,

After giving it a second thought, I will not be able to meet with you this afternoon as you had requested today. You may recall that I had mentioned in my previous email that I would prefer to keep our dialogue email-based because I am extremely busy trying to keep up with my workload and it leaves no room for miscommunication. Also, Two South is a large unit, and it takes me quite some time to bring the Activity Cart around. I am worried that I would not have time for a break, which is crucial to me given that I am pregnant with twins and need to eat frequently and cannot bypass my breaks as I have often done in the past.

I look forward to communicating with you on email, preferably my home email address, so that we are not infringing upon valuable work time[.]

Thompson did not consider this an acceptable response and went looking for Megivern to discuss the email. Thompson claims that she was told that Megivern was on her smoke break. Thompson waited for her to return, but she did not do so. When Thompson asked Kudlak where Megivern was, Kudlak looked at the time clock and saw that Megivern had gone on her lunch break despite the fact that she had an activity scheduled at that time. At this point, Thompson decided to suspend Megivern for insubordination for a week with pay, pending an investigation.

Megivern disputes that she missed a scheduled activity in order to take a lunch break. She claims that she had to postpone the activity to take her lunch break, that she informed Kudlak of this, and that she conducted the activity immediately following her break. Further, she contends that she could not have been on a smoking break when Thompson came looking for her because she did not smoke while she was pregnant.

Thompson directed Kudlak to conduct a full investigation. Thompson testified:

- 15 -

> I was aware that she was pregnant . . . I don't take ever letting an employee go lightly, they all have families to take care of, so I wanted to make sure that if this was the decision we were making, it was the right one based on the facts and the evidence and nothing else.

When asked by Kudlak whether Megivern could be fired given that she was pregnant, Thompson replied: "Everyone is held to the same standard regardless of their condition, so you just need to treat her and any other employee just as they're an employee, regardless, so it shouldn't matter whether she's pregnant or not, do not let that prevent you from doing your job." The investigation revealed that five assessments had not been completed at all; eleven of thirteen assessments were not completed within three days of the resident's admission; Megivern had not visited a certain resident who required one-on-one visits three times a week as specified in her care plan; May attendance logs contained no documentation of any family visits to residents; and that Megivern was using volunteers to compile records of family visits. The report also discussed Megivern's "insubordination issues with direct supervisor [Kudlak] and Executive Director of the Care and Rehabilitation Center [Thompson]," noting that Megivern refused to meet in person to discuss any issue and insisted that all communication be done in writing.

Glacier Hills terminated Megivern's employment on May 26, 2010. Thompson prepared and signed a termination notice, specifying the reason for termination as "performance," elaborating, "Employee placed on performance improvement plan 4/19/2010. Her performance did not improve to satisfactory status." Megivern's termination notice included a performance evaluation. Megivern was rated "unsatisfactory" in the following

categories: quality of work, quantity of work, promptness in completing assignments, attitude, acceptance of responsibility, and initiative. Thompson noted that Megivern "resisted or failed each of the significant components of the [PIP]." Thompson testified that Megivern's employment was terminated because of her performance, not her insubordination, but that the "entire picture of her prior work experience," including her adversarial behavior, was considered as part of the decision to fire her.

## II.

Megivern filed an amended complaint against Glacier Hills on September 22, 2011, alleging FMLA interference, ERISA interference, and sex discrimination on the basis of pregnancy under Title VII, Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and Ann Arbor's City Code. Glacier Hills moved for summary judgment on October 7, 2011, and on October 11, 2011, Megivern filed a motion to compel Glacier Hills to produce "any performance evaluations, discipline, warnings, performance improvement plans, exit interviews, or termination notices for any person who requested leave or became pregnant during the time Kim Thompson was Director." After a conference with the district court, Glacier Hills agreed to produce limited responsive discovery and the motion was terminated as moot. Megivern renewed her motion to compel on January 9, 2012, arguing that the materials received from Glacier Hills warranted full compliance with her original motion to compel. The district court granted summary judgment to Glacier Hills on all counts of Megivern's complaint and denied Megivern's motion to compel. Megivern timely appealed.

**III.**

**A. Standard of Review**

A district court's grant of summary judgment is reviewed de novo. *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 390 (6th Cir. 2009). Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. Single-Motive Discrimination**

Megivern alleges that Glacier Hills discriminated against her on the basis of her sex under Title VII, the ELCRA, and the Ann Arbor City Code by terminating her because of her pregnancy. Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Sex discrimination under Title VII includes discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k). The ELCRA provides similar protections, *see* Mich. Comp. Laws §§ 37.2202; 37.2201(d), and ELCRA claims are analyzed in the same manner as an analogous Title VII claim. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir. 2003). The Code of the City of Ann Arbor provides that "[n]o person shall discriminate in employment . . . or termination of employment of any person." Ann Arbor, Mich., Code ch.

112, § 9:151. The Code defines "discriminate" to include "mak[ing] a decision . . . on the actual or perceived . . . sex . . . [or] condition of pregnancy . . . of another person." *Id.* at § 9:151(4). The Code further allows individuals to bring a civil action for injunctive relief and damages against any individuals who have violated these provisions. *Id.* at § 9:164. The parties have analyzed the discrimination claim under the Ann Arbor City Code under the same framework as Title VII.

> In order to survive summary judgment on a sex discrimination claim:
>
> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

### 1. Prima facie case

In order to state a prima facie case for pregnancy discrimination, Megivern "must show that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)) (internal quotation marks omitted). Glacier Hills does not contest the first three elements of this test,

but argues that Megivern is unable to establish a nexus between her pregnancy and her termination.

Citing *Asmo*, the district court rejected this argument and found that Megivern's announcement of her pregnancy in early April, 2010 was sufficiently close in time to her termination on May 26, 2010 to satisfy the nexus requirement. In *Asmo*, the defendant selected the plaintiff for lay-off within two months of learning that she was pregnant. *Asmo*, 471 F.3d at 594. This court held that the temporal proximity between the announcement of the plaintiff's pregnancy and her termination was sufficient to establish a nexus between the two events for the purposes of establishing a prima facie case. *Id.* at 594. Megivern was terminated less than two months after announcing her pregnancy to her co-workers. Thus, the district court did not err in concluding that Megivern stated a prima facie case of pregnancy discrimination.

*2. Legitimate nondiscriminatory reason for termination*

Megivern argues that Glacier Hills has not articulated a nondiscriminatory reason for her termination. The district court did not consider whether Glacier Hills offered a legitimate, nondiscriminatory reason for termination, as it found that Megivern did not dispute that Glacier Hills terminated her employment because of her performance.

On appeal, Megivern argues that Glacier Hills never clearly articulated its reasons for her termination. The termination notice prepared by Thompson lists "Performance" as a "Reason Code" for Megivern's termination. Thompson described the events resulting in

Megivern's termination: "Employee placed on performance improvement plan 4/19/2010. Her performance did not improve to satisfactory status." The second page of the notice provides a performance evaluation at the time of termination. Thompson rated Megivern's performance as "unsatisfactory" in the following areas: (1) quality of work, (2) quantity of work, (3) promptness in completing assignments, (3) attitude, (4) acceptance of responsibility, and (5) initiative. Thompson further noted that Megivern "resisted or failed each of the significant components of the [PIP]." Megivern does not dispute that these comments comprised part of her termination notice; rather, she points to testimony by Thompson that Megivern was fired solely for performance issues, and suspended solely for insubordination. However, this assertion requires a selective reading of the facts; Thompson also discussed numerous issues with Megivern and testified that these issues were part of the "entire picture of her prior work" that resulted in Megivern's termination. Further, the termination notice indicates that Megivern's "performance" was partly based on the quality and quantity of her work, but also based on factors such as attitude, acceptance of responsibility, and initiative. Thus, Megivern is incorrect in arguing that Glacier Hills failed to provide a legitimate, nondiscriminatory reason for her termination.

### 3. Pretext

Pretext may be demonstrated if "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant

the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). At all times, "[t]he plaintiff retains the burden of persuasion." *Burdine*, 450 U.S. at 256.

Megivern argues that she has shown Glacier Hills's proffered reasons for terminating her employment were pretextual because: (1) Glacier Hills shifted its rationale for terminating Megivern, (2) the temporal proximity of Megivern's pregnancy to her termination weighs in favor of finding pretext, (3) Thompson did not congratulate Megivern on her pregnancy, warranting an inference of discrimination, and (4) pattern or practice evidence suggests a pattern of discrimination based on pregnancy at Glacier Hills.

> a. *Whether Glacier Hills employed shifting rationales for Megivern's termination.*

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). "Shifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). When a plaintiff is able to show that the defendant's justification for firing him changed over time, this can demonstrate a genuine issue of material fact that the proffered reason for termination is not only false, but that the falsity is a pretext for discrimination. *Id.*

Megivern argues that Glacier Hills's primary critique of Megivern's performance was her failure to complete initial assessments on time. She points to her PIP as specifying three areas where she performed below acceptable standards: completion of initial recreation history and assessment forms, completion of recreation and assessment forms on an annual

basis, and care plans. Megivern further points to her affidavit as demonstrating that at the time of her termination, she was up-to-date on her long-term resident assessments and care plans. Megivern argues that she was not the only LEC who completed late initial assessments, yet she was the only LEC terminated for this reason. To the extent that Glacier Hills's reason for termination extends beyond Megivern's late assessments, Megivern argues that this is a shifting rationale that warrants a finding of pretext as Thompson testified that Megivern was terminated for "performance." Further, Megivern argues that Kudlak testified that she believed the decision to terminate Megivern was caused by Megivern's refusal to meet with Thompson—not Megivern's late assessments.

Glacier Hills responds that its reasons for terminating Megivern have consistently remained the same: Megivern was terminated in part because of her failure to complete her work on time, and in part because of her poor attitude and behavior, and all of these reasons are reflected in Megivern's termination notice. Further, Glacier Hills argues that although it is true that Thompson testified that Megivern was terminated for performance reasons, she also testified that Megivern's work history and previous argumentative behavior were taken into account as part of the decision to fire her.

The district court determined that Megivern was unable to show pretext on the asserted grounds. The court noted that the termination notice specified numerous reasons for Megivern's termination and that Thompson elaborated on all of the ways that Megivern's performance fell short of Glacier Hills's expectations.

In contrast to the cases relied on by Megivern,[1] the rationale given for terminating Megivern's employment was clearly articulated in the termination notice prepared by Thompson and has remained the same since. Megivern's termination notice notes "unsatisfactory" performance in several areas, including attitude, acceptance of responsibility, and initiative. Thompson elaborated at her deposition that Megivern's entire work history was taken into account when determining whether to terminate her, and she pointed to Megivern's argumentative past as part of that decision. Further, the report prepared as part of the investigation into Megivern's performance indicates that insubordination issues were taken into account as part of her pre-termination evaluation. Megivern has failed to show that Glacier Hills employed shifting rationales for her termination.

To the extent that Megivern argues that she was singled out for discipline because of her pregnancy, her argument is without merit. Megivern's transfer to the Two South unit occurred months prior to the announcement of her pregnancy. She concedes that she had trouble completing her assessments as soon as she was transferred, and acknowledges that Kudlak held a meeting with all of the LECs in February, 2010 to discuss the late assessment issue. Megivern does not contest that Kudlak was hired to restructure the LEC department

---

[1]*Asmo*, 471 F.3d at 591 (shifting rationales where the two reasons a supervisor initially offered the plaintiff as reasons for the termination of her employment were false and eliminated at the commencement of the plaintiff's lawsuit); *Thurman*, 90 F.3d at 1167 (shifting rationales where initial explanation of a failure to hire changed during discovery).

and admits that of the five LECs employed at Glacier Hills when she worked there, only two remain. Further, Megivern testified that it is her understanding that her former supervisor, Kirk, was fired for turning in late assessments—a fact confirmed by Glacier Hills at oral argument. Megivern has not shown that she was singled out for adverse treatment.

> b.    *Whether the temporal proximity of Megivern's termination to the announcement of her pregnancy supports a finding of pretext.*

Megivern claims that the timing of the disciplinary actions taken against her warrant an inference that Glacier Hills's proffered reason for termination is pretextual. Specifically, Megivern argues that within two weeks of announcing her pregnancy she was placed on a PIP, and that she was suspended and her employment terminated a day after meeting with human resources to discuss FMLA and short-term disability benefits. Megivern argues that although her paperwork deficiencies began as soon as she was reassigned to work the Two South unit, she was only disciplined for late assessments after she announced her pregnancy. She clarifies that she is not arguing that the timing of her discipline is sufficient to warrant a finding of pretext, but rather that the temporal proximity of her discipline supports a finding of pretext.

Glacier Hills responds that although it is true that Megivern was only formally disciplined after announcing her pregnancy, she had a history of turning in late assignments. When Kudlak took over Megivern's duties once she went on vacation in April, she noticed that Megivern's problems were worse than she had realized and that Megivern had not followed through on directives Kudlak had given her in February.

Temporal proximity alone cannot prove pretext, but it can be used as indirect evidence to support a claim of pretext. *Asmo*, 471 F.3d at 598. A view of the evidence in the light most favorable to Megivern suggests that Glacier Hills's timing is suspect; however, this evidence must be accompanied by other, independent evidence of pretext for Megivern to succeed.

> *c. Whether Thompson's failure to congratulate Megivern on her pregnancy supports a finding of pretext.*

Megivern argues that Thompson's complete failure to congratulate Megivern on her pregnancy is significant evidence showing pretext because Thompson was the final decision-maker in the termination of Megivern's employment. Megivern relies on *Asmo* for this assertion. However, as Glacier Hills points out, *Asmo* is factually distinct as the supervisor in *Asmo* was directly told of the plaintiff's pregnancy during a conference call. *Id.* at 591. In that case, the supervisor's conspicuous silence warranted an inference of discrimination. In contrast, Megivern never had a face-to-face meeting or phone conversation with Thompson to tell her about her pregnancy, thus making *Asmo* distinguishable.

> *d. Whether Megivern's pattern or practice evidence supports a finding of pretext.*

Megivern points to evidence regarding three employees, Alicia Carey, Karen Klee, and Tabatha Smith, to argue that Glacier Hills has a practice of discriminating against employees who seek medical leave. Megivern argues that this evidence raises a triable issue of fact regarding pretext.

Evidence that an employer engaged in a pattern or practice of discrimination "may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004). "The question whether evidence of discrimination . . . is relevant . . . is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Among the factors to be considered in assessing "other acts" evidence are: whether the same actors were involved in each alleged retaliatory decision, the "temporal and geographical proximity" of the alleged other acts, "whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of retaliation." *Griffin v. Finkbeiner*, 689 F.3d 584, 598–99 (6th Cir. 2012).

Alicia Carey worked as a certified nurse assistant at Glacier Hills for nine years. She received excellent evaluations during this time. According to Carey, in September 2009, Thompson set off an emergency alarm during a state inspection, Carey retrieved the keys to shut off the alarm, and Thompson "grabbed the keys" from her hand. The next day, Carey was asked to meet with Thompson and the director of nursing. The director of nursing asked Carey why she had been "rude" to Thompson, and Carey apologized for her behavior, began crying, and explained that she was emotional because she was two months pregnant. Thompson told the director to "get rid of her" and left the office. Carey was removed from

the weekend schedule and told to go home. Thompson called her on Monday and told her that her employment had been terminated because of her insubordination. Carey believes she was dismissed because of her pregnancy.

Karen Klee worked at Glacier Hills for seven years as a unit secretary. Klee believes that everyone in the building was overworked, but only some employees were targeted for discipline. Klee announced that she was pregnant in July 2010. After she announced her pregnancy, her supervisor, Celia Williams, began "hounding" her and disciplining her for small performance issues. Klee believes that these actions were directed by Thompson as retaliation for Klee's pregnancy, though she does not specify the reason for her belief that Thompson was involved. In September 2010, Klee suffered a miscarriage and received six weeks of medical leave under the FMLA. When she returned, she continued to be subjected to discipline for "petty things," including work that had not been done while she was on leave. In November 2010, Klee suffered another medical emergency and was absent from work for one week. When she returned, she was fired for performance reasons, despite the fact that her PIP had not been completed. Klee believes the true reason for her dismissal was her pregnancy and the medical leave she took.

Tabatha Smith was the LEC who replaced Megivern. She started working for Glacier Hills in June 2010, but began experiencing medical difficulties in 2011. Smith fainted at work twice during the summer of 2011, and she began seeing a doctor for tests to diagnose her condition. Smith was diagnosed with shingles and placed on medical leave from August

4 to August 10. Although her supervisor was aware of her condition, Smith was given a "Final Written Warning" for unreliable attendance on August 25, 2011. The warning cited specific times when she had come to work late following her medical leave and criticized her professionalism and behavior at work. Smith was placed on a PIP and had a meeting with Thompson where she told Thompson that she believed she was being harassed and targeted for termination. Smith is "certain" that Thompson planned to terminate her in advance of her medical leave. Smith was on medical leave at the time she wrote her affidavit, although she had been informed that Glacier Hills would not hold a position open for her as she had exhausted the twelve weeks of medical leave she was allowed under the FMLA.

The district court rejected Megivern's assertion that these affidavits supported a finding of pretext, and we agree. Carey testified that she was terminated following an interaction that she had with Thompson during a state inspection. Carey interjected her pregnancy during the meeting with Thompson as an excuse for her behavior during the state inspection. The meeting had already been scheduled based on Carey's behavior and before Thompson knew she was pregnant.

Klee's and Smith's experiences are also distinct. Klee testified that she was only placed on a PIP *after* she took medical leave for a miscarriage. Klee returned to work and was placed on a PIP for performance reasons, and took another medical leave in November, 2010. She was fired after returning from this second medical leave. Although Klee expresses her belief that her alleged harassment was instigated by Thompson, she does not

explain her reason for this belief and her allegation appears to be purely speculative. Similarly, Smith has also failed to establish that Thompson was involved in her alleged harassment. She recounts a meeting with Thompson at which she believes Thompson planned to fire her, but concedes that she was not fired at this meeting. Indeed, Smith was never fired by Glacier Hills—she took a second medical leave and exhausted the amount of leave she was allowed under the FMLA. Neither affidavit supports Megivern's theory of the case—that she was placed on a PIP and fired in order to prevent her from taking medical leave. Klee's and Smith's affidavits fail to establish that Thompson was involved in their alleged harassment, and Carey's affidavit is factually distinct as Thompson was unaware of Carey's pregnancy prior to her disciplinary meeting.

Further, as part of Glacier Hills's discovery disclosures to Megivern, Megivern was given a log of all employees terminated since 2008; the names and addresses of all employees who had taken medical leave since Thompson became executive director of the Care and Rehabilitation Center in 2009, together with the dates of their personal leave, their job title, current employment status with Glacier Hills, and whether the termination of their employment was voluntary or involuntary (if applicable); the personnel records of twenty-two employees identified by Megivern; and a list of twenty-one employees who had requested leave and their current employment status with Glacier Hills. From these disclosures, Megivern identified the three employees discussed above, all of whom present

factually distinct circumstances from Megivern's case.  We agree with the district court that Megivern's pattern or practice evidence does not support her claim.

Considering Megivern's evidence as a whole, the district court did not err in concluding that Megivern does not present enough evidence to warrant a finding of pretext. The only evidence that weighs in her favor is the temporal proximity of her dismissal to the announcement of her pregnancy.  However, this evidence alone is insufficient to warrant a finding of pretext.  *See Asmo*, 471 F.3d at 598. We affirm the district court's grant of summary judgment on Megivern's single-motive discrimination claims.

## C.  Megivern's FMLA and ERISA Interference Claims

Megivern argues that because Glacier Hills terminated her employment shortly after she met with the human resources department to discuss short-term disability benefits and FMLA leave, Glacier Hills unlawfully interfered with the exercise of rights and benefits due her under the FMLA and ERISA.

As with Megivern's single-motive sex discrimination claims, we apply the *McDonnell Douglas* burden-shifting framework because Megivern presents indirect evidence of discrimination.  *Donald*, 667 F.3d at 762; *Humphreys*, 966 F.2d at 1043.  Because Megivern is unable to prove pretext under the *McDonnell Douglas* burden-shifting framework, she cannot succeed on either claim.  We affirm the district court's grant of summary judgment on these claims.

## D.  Mixed-Motive Discrimination

Megivern argues that even if she has not demonstrated pretext, she has presented enough evidence to demonstrate a mixed-motive claim of pregnancy discrimination. Under Title VII, an "unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating favor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

In *White v. Baxter*, this court held that the *McDonnell Douglas* burden-shifting framework does not apply to the summary judgment analysis for Title VII mixed-motive claims. 533 F.3d 381, 400 (6th Cir. 2008). To survive summary judgment, a plaintiff asserting a mixed-motive claim "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor." *Id.* (emphasis in original) (internal quotation marks omitted). "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* This lenient summary judgment standard "is counterbalanced by potential restrictions on a plaintiff's recovery for a mixed-motive claim." *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010). Under a mixed-motive theory of discrimination, Megivern can only recover declaratory relief, injunctive relief, and attorney's fees and costs directly attributable to the mixed-motive claim. 42 U.S.C. § 2000e-5(g)(2)(B).

The district court granted summary judgment to Glacier Hills on Megivern's mixed-motive claim, reasoning that although Megivern argued that other LECs who were behind in their paperwork were not disciplined or fired, Megivern was fired for more than just her failure to complete initial assessments.

Aside from the temporal proximity of the termination of Megivern's employment to the announcement of her pregnancy, Megivern has not presented any evidence that the termination of her employment was motivated in part by discriminatory animus. Megivern's 2009 review suggested that her attitude at work was a problem. Further, she admits that she began having trouble completing her workload as soon as she was assigned to the Two South unit, months before she became pregnant. Thompson testified that Megivern's entire work history, including her argumentative and insubordinate behavior, was taken into account as part of the decision to terminate her. Despite the lenient summary judgment standard for mixed-motive claims, Megivern has not provided evidence that her termination was based in part on her pregnancy. We affirm the district court's grant of summary judgment.

**E. Motion to Compel**

Lastly, Megivern argues that the district court erred by denying her renewed motion to compel the production of certain employees' disciplinary files. We review a district court's decision regarding discovery requests for abuse of discretion. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). We reverse only if "we are firmly convinced of a mistake that affects substantial rights and amounts to more than harmless error." *Id.*

Megivern moved to compel production of "any performance evaluations, discipline, warnings, performance improvement plans, exit interviews, or termination notices for any person who requested leave or became pregnant during the time Kim Thompson was Director." At the time Megivern first brought this motion, Glacier Hills had already disclosed two logs to Megivern: the first listed every employee who had been terminated since 2008, and the second listed the names and addresses of every employee who had taken leave since Thompson began working for Glacier Hills in 2009. This second log also contained the job title of each employee, their current employment status with Glacier Hills, and whether their employment was terminated voluntarily or involuntarily if they were no longer employed at Glacier Hills. Megivern also requested and received the personnel records of twenty-two employees. Following her motion to compel, the court met with the parties and devised a plan for Glacier Hills to provide some of the additional information Megivern sought. The parties compiled a survey that Glacier Hills presented to ten of its supervisors, asking them to identify any employee who asked about leave or disability benefits, disclosed a pregnancy or serious health condition, or requested maternity or medical leave. Glacier Hills identified twenty-one employees through this survey and these employees' files were given to Megivern as well. From this information, Megivern claimed to have identified two employees who were treated unfairly (Tabatha Smith and Glenna Barnes). Megivern renewed her motion to compel, arguing that complete fulfillment of the

discovery request was justified.  The district court disagreed, noting that the burden imposed on Glacier Hills was unlikely to outweigh the benefit sought by Megivern.

It was not unreasonable for the district court to reject Megivern's request for broader discovery, given that she was unable to unearth relevant evidence after Glacier Hills provided her with the names of all persons whose employment was terminated, as well as employee leave information and the personnel files of employees specifically identified through this information.  Therefore, we affirm the district court's denial of Megivern's motion to compel.

## IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to Glacier Hills on all of Megivern's claims.